**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

JOANN JOHNSON,

        CASE NO. 06-CV-13904

    Plaintiff,

        PAUL D. BORMAN
-vs-        UNITED STATES DISTRICT JUDGE

MICHAEL SAKOSKI and
SMART,

    Defendants.
_____/

**OPINION AND ORDER**
**(1) GRANTING DEFENDANT SMART'S MOTION FOR SUMMARY JUDGMENT;**
**(2) GRANTING IN PART AND DENYING IN PART DEFENDANT SAKOSKI'S**
**MOTION FOR SUMMARY JUDGMENT; AND (3) DENYING PLAINTIFF'S REQUEST**
**TO STAY THE PROCEEDINGS**

    Before the Court is Defendants Michael Sakoski and SMART's July 30, 2007 Motion for Summary Judgment. (Doc. No. 24). Plaintiff Joann Johnson ("Plaintiff") filed her Response on August 21, 2007. In her Response, Plaintiff also requests that the Court stay the summary judgment proceedings until Defendants turn over certain discovery. The Court held a motion hearing on December 13, 2007. At the motion hearing, the Court requested supplemental briefing from the parties on whether Plaintiff's claim against Sakoski should be characterized as a Due Process claim under 42 U.S.C. § 1983, rather than a Fourth Amendment claim under that statute. Both parties submitted the requested briefing. Having considered the entire record, and for the reasons that follow, the Court GRANTS SMART's Motion for Summary Judgment, GRANTS IN PART and DENIES IN PART Sakoski's Motion for Summary Judgment, and DENIES Plaintiff's request to amend the scheduling order or to stay the proceedings.

1

## I. BACKGROUND

This case arises from Plaintiff's allegations that Sakoski, a bus driver for the Suburban Mobility Authority for Regional Transportation ("SMART"), used offensive language towards Plaintiff, a passenger, and then pushed her from the bus.

Plaintiff is a resident of the City of Detroit in Wayne County, Michigan. (Am. Compl. ¶ 1). SMART is a public transportation authority created under Michigan law. *See* Mich. Comp. Laws § 124.401 *et seq*. Michigan law classifies public transportation authorities as political subdivisions of the State of Michigan for the purposes of governmental immunity. Mich. Comp. Laws § 691.1401(b).

On or about August 7, 2003, Plaintiff and her companion, Jessica Hubbard, were waiting for a SMART bus on Seven Mile Road in Detroit. (Def. Br. Ex. 1, Johnson Dep. 18). Plaintiff contends that they attempted to flag down the bus, and that Sakoski saw them but did not stop. (*Id*. at 19).

Plaintiff and Hubbard crossed Seven Mile Road to attempt to catch that bus. (*Id*. at 20). Plaintiff contends that Sakoski then passed them at the bus stop a second time. (*Id*. at 29). Plaintiff and Hubbard then proceeded to Seven Mile Road and Winston Street to attempt to catch the bus a third time. (*Id*.). At the third stop, they successfully boarded the bus.

Thereafter, upon exiting the bus, Plaintiff asked Sakoski why he continually passed up Plaintiff and Hubbard. (*Id*. at 35). Sakoski purportedly responded that "he did not have to cater to lesbians." (*Id*. at 39:2). Plaintiff denies that she ever used any foul language or racist statements toward Sakoski prior to his response. (*Id*. at 39, 43). Plaintiff then told Sakoski that "he was a bus driver and that it was his responsibility to pick [her] up regardless of how he felt."

(*Id*. at 44:18-20). Sakoski then told her, "Get off my bus. Come on let's go. I got to go. Get off my bus." (*Id*. at 44:22-23). Per Plaintiff, Sakoski, then still sitting in his driver's chair, pushed Plaintiff from the stationary bus. (*Id*. at 44-45). Plaintiff alleges that Sakoski pushed her on her left arm through the bus doorway and that Plaintiff then fell to the sidewalk. (*Id*. at 45-46). The bus in question did not have stairs, the doorway was approximately level with the sidewalk. (*Id*. at 46).

Plaintiff maintains that she landed on the right leg, but did not fall to the ground. (*Id*. at 47, 52). Plaintiff and Hubbard proceeded to walk to Plaintiff's home, about a seven-to-ten minute walk from the bus stop. (*Id*. at 54). Plaintiff claims she experienced severe pain in her right leg, and that she called an ambulance once she returned to her house. (*Id*.).

Sakoski maintains that he did not know that Plaintiff was a lesbian. (Def. Br. Ex. E, 10/18/2004 36th Dist. Ct. Tr. 72). Sakoski contends that when Plaintiff got on the bus, she offered vulgarities, stating, "[W]hy did you pass us by, you white motherf***er, you white honky, you s[o]n of a bitch." (*Id*. at 72:7-9). Sakoski denies that any conversation occurred between Plaintiff and him, and that he ever pushed Plaintiff from the bus. (Pl. Br. 18, Sakoski Dep. 33).

Sakoski composed what appears to be an incident report on October 9, 2003. (Pl. Br. 15).[1] In that report, Sakoski claimed that Plaintiff was a "very inebriated, and belligerent person," and denied making any sexual comments. (*Id*.). At his deposition, Sakoski testified that he did not smell alcohol on her breath, did not observe bloodshot eyes or stumbling, and

---

[1] Plaintiff's Response does not include her relevant exhibits as attachments to her brief – but rather simply blockquotes the relevant portions.

3

admitted that he "just thought that [she] was being aggressive towards [him]." (Sakoski Dep. 28).[2]

Plaintiff called SMART the next day to make a complaint about the incident. (Johnson Dep. 68).[3] SMART provided Plaintiff with the phone number of SMART's insurance carrier. (*Id*.). Plaintiff then contacted SMART's insurance carrier, who informed her several days later that she did not have a claim. (*Id*.).

As a result of the incident, Plaintiff maintains that she has developed depression and "has undergone expensive and continuous therapy and has been placed on psychotropic medication for her depression." (Am. Compl. ¶¶ 11-12).

The Wayne County Prosecutor's Office subsequently filed a criminal charge of Assault or Assault and Battery against Sakoski, pursuant to Mich. Comp. Laws § 750.81(1). A magistrate authorized the criminal complaint on November 3, 2003. (Supp. Ex. 1, Criminal Complaint). A jury trial was held before Judge Paula G. Humphries in 36th District Court in Detroit, Michigan between October 18 and 20, 2004. *See People v. Sakoski*, No. 03-66111 (36th Dist. Ct. Oct. 20, 2003). At the trial, a number of witnesses testified, including Sakoski.

Plaintiff testified at trial that she had seen Sakoski many times before. (Supp. Br. Ex. B, 10/18/03 Trial Tr. at 5). She testified that Hubbard and she took the SMART bus on route 315 for at least three weeks prior to the August 7, 2003 incident. (*Id*. at 6). Plaintiff stated that from

---

[2] At his deposition, Sakoski additionally testified that he had: (1) no personal feelings towards gay and lesbian people; (2) never used the words "lesbian," "dyke," or "fag" in his life; (3) never believed any of his passengers on his bus to be gay or lesbian; and (4) never had a conversation regarding gay or lesbian individuals. (Sakoski Dep. 15, 22-23).

[3] Prior to the incident in question, Plaintiff had filed a complaint with SMART regarding another incident. (*Id*. at 38). According to Plaintiff, she followed up with SMART shortly thereafter; and SMART informed her that incidents were handled "in-house." (*Id*. at 38:15).

4

2001 to 2003, Sakoski had passed her up about seven or eight times on different bus routes, and that she lodged several complaints with SMART by telephone. (*Id*. at 37-38, 41-42).

On the day of the incident, Plaintiff testified that there were a few women and a man on the bus. (*Id*. at 44). Plaintiff indicated that Hubbard and she sat at the back of the bus "hugged up," and that Sakoski would look in the mirror back at them and ask them where they were going. (*Id*. at 7-8). Plaintiff stated that Sakoski had passed them up twice the evening of August 7. (*Id*. at 9-10). When Hubbard and she were getting off the bus, Plaintiff admitted that she asked Sakoski why he kept passing them up. (*Id*. at 10). Per Plaintiff, Sakoski told her that he did not have to cater to lesbians and pushed her from the bus while seated in his driver's chair. (*Id*. at 10-11). Plaintiff indicated that she had her back turned to Sakoski when he allegedly pushed her with his right hand. (*Id*. at 14-15). Plaintiff "flew off the bus" and "came down on her legs wrong." (*Id*. at 47). Plaintiff maintained that Hubbard, who had left the bus before her, then came back to confront Sakoski about pushing Plaintiff from the bus. (*Id*. at 44).

Plaintiff further admitted that she "may have" cursed at Sakoski when getting off the bus, but denied using the terms "white motherf****er" or "white honkie." (*Id*. at 34-35). Plaintiff then stated that she arrived home, called SMART to complain, called the police to give an over-the-phone statement, and then called an ambulance. (*Id*. at 11-12, 42-43).

Hubbard confirmed that Sakoski had passed by Plaintiff and her twice before picking them up. (10/19/03 Trial Tr. at 7-8). Hubbard indicated that they took a seat in the middle of the bus and that there was another woman passenger on the bus. (*Id*. at 8, 12). She testified that Plaintiff and Sakoski "were having confrontation words," that Sakoski indicated that "he did not cater to lesbians," and shoved Plaintiff from the bus. (*Id*. at 9). Hubbard stated that Plaintiff was

5

facing Sakoski when she was pushed. (*Id*. at 16). Per Hubbard, Plaintiff fell onto her right leg, remaining on the ground for about three minutes before Hubbard helped Plaintiff up from the ground. (*Id*. at 10, 20). Hubbard stated that Plaintiff called the police the next morning. (*Id*. at 22-23).

Donna Elizabeth Davis, a customer service representative for SMART at the time of the incident, and at the time Sakoski's union representative, testified that she only could find one complaint lodged by Plaintiff against Sakoski – from the August 2003 incident. (*Id*. at 46, 48). The complaint stated that Sakoski was "rude, reckless and negligent." (*Id*.). Davis further indicated that it was standard procedure that all customer complaints were logged into the system and investigated. (*Id*. at 48-50). Davis indicated that as Sakoski's union representative, she was not aware of any disciplinary action taken against him. (*Id*. at 54).

Debra Gantz Fuller, a road supervisor for SMART whose duties included ensuring that busses were arriving on time and investigating complaints, testified that on August 8, 2003, her supervisor informed her verbally that an individual complained that Sakoski committed a "pass by" on a passenger. (*Id*. at 60). Fuller then stated that after following Sakoski's bus around for two weeks to verify whether he was in fact not picking up passengers, she did not observe him passing anyone by. (*Id*. at 60, 62.). Fuller testified that she only found out about a written complaint and the allegations of a "push" in the middle of September when a police officer called the terminal to inform SMART that Sakoski had to be "held over" on the instant criminal charges. (*Id*. at 61, 65).

Sakoski testified in his own defense at trial. Sakoski denied passing Plaintiff and Hubbard on several occasions, ever seeing them before, or knowing that they were lesbians. (*Id*.

at 70, 72, 76). Sakoski stated that there were no other passengers on the bus at the time of the incident. (*Id*. at 71). Per Sakoski, Plaintiff asked him why he passed them by and then called him a "white motherf\*\*\*er," white honky," and "son of a bitch." (*Id*. at 72). When the bus arrived at K-Mart, Hubbard exited the bus; and Plaintiff asked him again why he passed them by, a "white son of a bitch," and then turned around and got off the bus. (*Id*. at 73-74). Sakoski denied ever pushing Plaintiff or otherwise demanding that she exit the bus. (*Id*. at 75). At the police station, Sakoski told the police officers that a "man and a lady" claimed that they were passed up at a bus stop. (*Id*. at 76).

The jury started their deliberations on the morning of October 20, 2003. The jury returned a "not guilty" verdict. (Supp Br. Ex. C, Verdict Form).

On August 7, 2006, Plaintiff filed a civil action against Sakoski and SMART in Wayne County Circuit Court, alleging various state law torts and federal claims under 42 U.S.C. § 1983. On September 1, 2006, Defendants removed the case to federal court.

On February 23, 2007, Plaintiff filed an Amended Complaint, stating the following counts against Defendants:

    Count III:    Intentional Infliction of Emotional Distress (state law)
    Count IV:    Fourth Amendment Violations for Use of Excessive Force
    Count V:    Municipal Liability under § 1983
    Count VI:    Gross Negligence in Hiring and Supervision (state law)

On July 30, 2007, Defendants moved for summary judgment on all claims.

On August 21, 2007, Plaintiff filed a Response. Plaintiff's brief also included a request to compel SMART to produce the internal investigation file of the incident, to re-depose Sakoski, and otherwise modify this Court's May 23, 2007 scheduling order.

At the December 13, 2007 motion hearing, the Court requested that the parties submit supplemental briefing on whether Plaintiff's claimed Fourth Amendment violation in the Amended Complaint actually stated a Fourteenth Amendment Due Process claim. Both parties submitted the requested supplemental briefs.

**II.     ANALYSIS**

**A.     Plaintiff's Motion to Compel or to Modify the Scheduling Order**

In her August 21, 2007 Response brief, Plaintiff contends that SMART's motion for summary judgment is "unripe" since SMART failed to turn over records of SMART's internal investigation of the incident. Plaintiff maintains that she did not discover the fact of the investigation until the Sakoski's deposition on July 19, 2007. Plaintiff requests that the Court: (1) order SMART to turn over the internal investigation records; (2) permit Plaintiff to re-depose Sakoski; and (3) stay the summary judgment proceedings until Plaintiff can obtain this discovery.

SMART responds that: (1) under Fed. R. Civ. 26(a)(1)(B), it was only required to disclose evidence that it would use to support its claims and defenses; (2) Plaintiff has conducted essentially no discovery in the case outside of the deposition of Sakoski – including any interrogatories, requests to produce, or requests for admission; and (3) even after learning about the internal investigation on July 19, 2007, Plaintiff made no effort to request the information before the close of discovery on July 30.

Rule 26(a)(1)(B) provides:

(1)     Except in categories of proceedings specified in Rule 26(a)(1)(E), or to the extent otherwise stipulated or directed by order, a party must, without awaiting a discovery request, provide to other parties:

8

. . . .

> (B) a copy of, or a description by category and location of, all documents, electronically stored information, and tangible things that are in the possession, custody, or control of the party and that the disclosing party may use to support its claims or defenses, unless solely for impeachment[.]

The 2000 Advisory Committee Notes to Rule 26 state:

> The initial disclosure obligation of subdivisions (a)(1)(A) and (B) has been narrowed to identification of witnesses and documents that the disclosing party may use to support its claims or defenses. "Use" includes any use at a pretrial conference, to support a motion, or at trial. The disclosure obligation is also triggered by intended use in discovery, apart from use to respond to a discovery request; use of a document to question a witness during a deposition is a common example. The disclosure obligation attaches both to witnesses and documents a party intends to use and also to witnesses and to documents the party intends to use if – in the language of Rule 26(a)(3) – "the need arises."
>
> A party is no longer obligated to disclose witnesses or documents, whether favorable or unfavorable, that it does not intend to use. The obligation to disclose information the party may use connects directly to the exclusion sanction of Rule 37(c)(1). Because the disclosure obligation is limited to material that the party may use, it is no longer tied to particularized allegations in the pleadings. Subdivision (e)(1), which is unchanged, requires supplementation if information later acquired would have been subject to the disclosure requirement. As case preparation continues, a party must supplement its disclosures when it determines that it may use a witness or document that it did not previously intend to use.

Accordingly, Rule 26(a)(1)(B) and its accompanying Notes clearly state that a party is only required to disclose the relevant information that it intends to use to support or defend its case. SMART has indicated that it does not intend to use the internal investigation information in support of its claims and defenses. Moreover, Plaintiff did not ever request such information in discovery on the record, nor did she ever make a formal discovery request for this information once she became aware of it on July 19. Pursuant to this Court's scheduling order, discovery

9

closed on July 30; and Plaintiff never formally requested, before the dispositive motion cut-off date, to extend the discovery deadlines to obtain this information.[4]

Therefore, the Court DENIES Plaintiff's request to extend the discovery deadlines or to stay the case.

### B. Summary Judgment Standard

The United States Court of Appeals for the Sixth Circuit has recently summarized the relevant legal standard for summary judgment motions:

> Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." In reviewing a motion for summary judgment, we view the evidence, all facts, and any inferences in the light most favorable to the nonmoving party. "To withstand summary judgment, the non-movant must show sufficient evidence to create a genuine issue of material fact." A mere scintilla of evidence is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]."

*Thomas v. Speedway SuperAmerica, LLC*, 506 F.3d 496, 500-01 (6th Cir. 2007) (internal citations omitted).

### C. Excessive Force under § 1983 against Defendant Sakoski

Defendants contend that Plaintiff cannot maintain an excessive force claim under § 1983 since Sakoski's actions did not rise to the level of "shocking the conscience" under the Due Process Clause of the Fourteenth Amendment. Defendants further argue that "[i]t is absurd to

---

[4] Alternatively, to the extent that Plaintiff seeks to modify the scheduling order, Fed. R. Civ. P. 16(b) states that "[a] schedule shall not be modified except upon a showing of good cause." "The primary measure of Rule 16's good cause' standard is the moving party's diligence in attempting to meet the case management order's requirements. A district court should also consider possible prejudice to the party opposing the modification." *Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 830 (6th Cir. 2005) (quotation and citation omitted). Plaintiff has failed to make any showing of "good cause" in this instance to modify the scheduling order to extend discovery. Reopening and redeposing would prejudice Defendants.

suggest that every boorish act by a public employee, no matter how minor in terms of the act itself or the consequence of the action, gives rise to a claim for deprivation of Constitutional rights." (Def. Br. 10).

The parties agree that Plaintiff's claim is properly characterized, not as in Plaintiff's Brief as a Fourth Amendment claim, but as a Due Process claim under the Fourteenth Amendment. Although § 1983 excessive force claims have typically been brought against police officer defendants in search and seizure situations, the Sixth Circuit has summarized the law to be applied when a plaintiff brings an excessive force claim where the alleged excessive force was not accompanied by a search or seizure:

> While excessive force claims are often best analyzed under the Fourth Amendment's protection against unreasonable seizures, the Supreme Court has recently cautioned that not "all constitutional claims relating to physically abusive government conduct must arise under either the Fourth or Eighth Amendments[.]" Instead, the Court noted that "*Graham* simply requires that if a constitutional claim is covered by a specific constitutional provision, such as the Fourth or Eighth Amendment, the claim must be analyzed under the standard appropriate to that specific provision, not under the rubric of substantive due process." Thus, while the Fourth Amendment "objective reasonableness" analysis should be used in excessive force cases involving searches and seizures, where there is no search or seizure, the Supreme Court has held that the substantive component of the Fourteenth Amendment's due process clause is the most appropriate lens with which to view an excessive force claim.
>
> A substantially higher hurdle must be surpassed to make a showing of excessive force under the Fourteenth Amendment than under the "objective reasonableness" test of *Graham,* in which excessive force can be found if the officer's actions, in light of the totality of the circumstances, were not objectively reasonable. The substantive due process rights of the Fourteenth Amendment protect citizens from the arbitrary exercise of governmental power. The test applied by the Supreme Court to determine when governmental conduct reaches this threshold is to ask whether the alleged conduct "shocks the conscience." In *Lewis,* the Supreme Court explained that whether governmental conduct shocks the conscience depends on the factual circumstances of the case. More specifically, in situations where the implicated government actors
>
>> are afforded a reasonable opportunity to deliberate various

11

> alternatives prior to electing a course of action . . . ., their actions will be deemed conscience-shocking if they were taken with "deliberate indifference" towards the plaintiff's federally protected rights. In contradistinction, in a rapidly evolving, fluid, and dangerous predicament which precludes the luxury of calm and reflective pre-response deliberation . . . ., public servants' reflexive actions "shock the conscience" only if they involved force employed "maliciously and sadistically for the very purpose of causing harm" rather than "in a good faith effort to maintain or restore discipline."

*Darrah v. City of Oak Park*, 255 F.3d 301, 305-06 (6th Cir. 2001) (internal citations omitted). "[C]onduct intended to injure in some way unjustifiable by any government interest is the sort of official action most likely to rise to the conscience-shocking level." *County of Sacramento v. Lewis*, 523 U.S. 833, 849 (2003).

At this stage, the Court must view the evidence in the light most favorable to Plaintiff and finds that she has satisfied the "shock the conscience" test for the purposes of Due Process under the Fourteenth Amendment. Plaintiff's evidence alleges that Sakoski acted intentionally in a "malicious and sadistic" manner "for the very purpose of causing harm." Moreover, Sakoski does not contend that his actions constituted a "good faith effort to maintain or restore discipline," or that the conduct in question was justifiable by any government interest.

Sakoski's essential rebuttal – that Plaintiff's injuries were not "severe enough" to support an excessive force claim – lacks merit. Plaintiff has produced evidence of physical and emotional harm as a result of the incident. Plaintiff's emergency medical records from the Detroit Medical Center indicate that Plaintiff suffered "musculoskeletal strain" in her right leg. (Def. Br. Ex. B, Emergency Medical Records 5-7). As discussed, *infra*, Plaintiff psychiatric records also note emotional stress as a result of the incident. (Def. Br. Ex. C, Medical Records). The Sixth Circuit has recognized that a plaintiff can maintain an excessive force claim even if the incident did not

cause extensive physical damage and can also maintain a claim based upon emotional harm. *See Lyons v. City of Xenia*, 417 F.3d 565, 587 (6th Cir. 2005).

Therefore, the Court DENIES summary judgment to Sakoski on Plaintiff's excessive force claim.

### D. Municipal Liability under § 1983 against Defendant SMART

SMART claims that Plaintiff has failed to support with evidence her § 1983 municipal liability claim based on failure to train, supervise, or discipline. The Court agrees. Plaintiff's Response does not proffer any evidence to buttress her municipal liability claim. At the summary judgment stage of the case, Plaintiff has an obligation to present "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986). Since Plaintiff has failed to do so, the Court GRANTS summary judgment to SMART on Plaintiff's municipal liability claim.

### E. State Law Claims

#### 1. Intentional Infliction of Emotional Distress

Sakoski contends that Plaintiff has not demonstrated a viable claim of intentional infliction of emotional distress, arguing that: (1) her alleged injuries were minor; and (2) Plaintiff has not shown that she has suffered from severe emotional distress as a result of the incident.

The Sixth Circuit has summarized the legal principles underpinning a claim of intentional infliction of emotional distress under Michigan law:

> Under Michigan law, to state a claim for intentional infliction of emotional distress, [a plaintiff] must allege extreme or outrageous conduct which intentionally or recklessly, causes extreme emotional distress.
>
> "Liability for the intentional infliction of emotional distress has been found only where the conduct complained of has been so outrageous in character, and so

extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community." Liability will not be found for "mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities"; rather, the case must be one in which the facts would arouse the resentment of an average member of the community against the actor, leading him to exclaim, "Outrageous!"

The distinction between conduct which might lead one to exclaim "outrageous," and that which is merely "petty oppression," is key. It is generally the duty of the trial court to determine whether a defendant's alleged conduct may reasonably be regarded as so "outrageous." Where reasonable minds may differ, the question is for the jury. . . .

"A plaintiff can show that a defendant specifically intended to cause a plaintiff emotional distress or that a defendant's conduct was so reckless that 'any reasonable person would know emotional distress would result.'"

. . . .

Additionally, the tort requires actual "emotional distress." Actionable emotional distress is characterized by some egregious mistreatment which is "beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community."

*Garretson v. City of Madison Heights*, 407 F.3d 789, 799-800 (6th Cir. 2005) (internal citations omitted).

The Court finds that since reasonable minds could not differ as to whether Sakoski's alleged conduct was "so outrageous," he is entitled to summary judgment on Plaintiff's IIED claim.

The Court does not find the alleged conduct to travel beyond "all possible bounds of decency and to be regarded as atrocious, and utterly intolerable in a civilized community." The facts of the instant case, involving an alleged insult and a physical push by Sakoski, while seated in his driver's seat, fall more clearly into the category of "petty oppressions," rather than overcoming the significant threshold under Michigan law to support an IIED claim.

Therefore, the Court GRANTS summary judgment to Sakoski on Plaintiff's IIED claim.

2. Gross Negligence in Hiring or Supervision

SMART contends that although plead in the Complaint, Plaintiff has failed to provide any factual support for her gross negligence in hiring or supervision claim. The Court agrees. At the summary judgment stage of the case, Plaintiff has an obligation order to present some "specific facts showing that there is a genuine issue for trial." *Celotex*, 477 U.S. at 324.

Since Plaintiff has not carried her burden for the purposes of summary judgment, the Court GRANTS Defendant's motion on Plaintiff's gross negligence claim.

### III. CONCLUSION

Accordingly, the Court hereby:

(1) **GRANTS** Defendant SMART's Motion for Summary Judgment;

(2) **DENIES** Defendant Sakoski's Motion for Summary Judgment on Plaintiff's § 1983 claim;

(3) **GRANTS** Defendant Sakoski's Motion for Summary Judgment on Plaintiff's IIED claim; and

(4) **DENIES** Plaintiff's request to amend the scheduling order to stay the proceedings.

**SO ORDERED.**

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: January 3, 2008

CERTIFICATE OF SERVICE

Copies of this Order were served on the attorneys of record by electronic means or U.S. Mail on January 3, 2008.

                                          s/Denise Goodine
                                          Case Manager